**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>FRANCISCO PULIDO CORACERO and CARLOS ALGREDO VAZQUEZ,<br><br>Defendants. | Criminal Case No. 21-173 (BAH)<br>Judge Beryl A. Howell |

**MEMORANDUM AND ORDER RESOLVING VARIOUS PRETRIAL MOTIONS**

Defendants Francisco Pulido Coracero ("Pulido") and Carlos Algredo Vazquez ("Algredo") face trial on January 11, 2027 on two charges of engaging in two conspiracies from around 2011 until March 2, 2021, to "manufacture and distribute five hundred (500) grams or more of…methamphetamine, a Schedule II controlled substance," for unlawful importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(H) and 963 (Count One), and to distribute List I and II precursor chemicals "intending and knowing that such chemicals would be used to manufacture" methamphetamine for importation into the United States, in violation of 21 U.S.C. §§ 959(b), 960 and 963 and 18 U.S.C. § 2 (Count Two). Indictment, ECF No. 1. In brief, the government proffers that defendants "used the veneer of a [legitimate] business operation to conceal their criminal aims," on behalf and at the bequest of a criminal narcotics trafficking cartel, the *Cartel de Jalisco Nueva Generacion* ("CJNG"), to import to Mexico tonnage quantities of precursor chemicals "to manufacture, produce, refine and mask a wide variety of drugs, including methamphetamine, fentanyl, PCP and cocaine." Gov't's Mot. *in Limine* Introduce & Authenticate Evid. at 1-2, ECF No. 79. Defendants do not deny that they were involved in transactions to import into Mexico and resell precursor chemicals, but Algredo's

defense is that he "owned and operated a legitimate chemical brokerage business in Mexico and the United States and had many clients for whom he brokered deals involving the importation of chemicals into Mexico," and he "was not involved in the manufacture or distribution of methamphetamine or the importation of" this illegal drug into the United States. Joint Pretrial Statement at 2, ECF No. 93. Likewise, Pulido asserts that he "owned and operated legitimate businesses engaged in the purchase and resale of bulk quantities of multi-purpose chemicals" and denies involvement "in the manufacture or distribution of methamphetamine or the importation of methamphetamine into the United States." *Id.*

As background, defendant Algredo's brother, Javier Algredo Vazquez, was previously convicted in 2023, following a jury trial, of all three charges against him for conspiring to manufacture and distribute 500 grams or more of methamphetamine for unlawful importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(H) and 963; conspiring to distribute methylamine for unlawful importation into the United States, in violation of 21 U.S.C. §§ 959(b), 960 and 963; and conspiring to launder monetary instruments, in violation of 18 U.S.C. § 1956(a)(2)(A), (h). *United States v. Vazquez*, No. 21-cr-597 (BAH), 2023 WL 7128473, at *1 (D.D.C. Oct. 30, 2023). At that trial, the government presented testimony from cooperating witnesses, wiretap calls and documentary evidence linking Javier Algredo Vazquez, as well as the two defendants in the instant case, to shipments of precursor chemicals for the CJNG and used by the CJNG to manufacture methamphetamine for importation into the United States.

## I. PENDING PRETRIAL MOTIONS

The following five pretrial motions filed by the parties are addressed *seriatim*: (1) Algredo's Motion to Suppress In-Court Identification ("Algredo's ID Mot."), ECF No. 77; (2) Pulido's Motion to Suppress In-Court Identification ("Pulido's ID Mot."), ECF No. 78; (3) the United States' Motion *in Limine* to Introduce and Authenticate Evidence ("Gov't's MIL"), ECF

No. 79; (4) Algredo's Motion *in Limine* to Preclude Testimony of Drugs Other Than Methamphetamine ("Algredo's MIL"), ECF No. 73; and (5) Pulido and Algredo's Motions to Sever ("Pulido's Sever Mot." and "Algredo's Sever Mot."), ECF Nos. 76 and 82, respectively.[1] Two of the same challenges to evidence admissible at trial raised in these pending pretrial motions were addressed in the criminal proceedings against Javier Algredo Vazquez and are resolved similarly here. *See, e.g.*, *United States v. Vazquez*, 2023 WL 4488910, at *1 (D.D.C. July 12, 2023) (granting government's motion to admit business records pursuant to Fed. R. Evid. 803(6) and Fed. R. Evid. 902(11); certain uncharged acts pursuant to Fed. R. Evid. 404(b) and 403; and electronic evidence derived from two email addresses used by Javier Algredo Vazquez); *United States v. Vazquez*, No. 21-cr-597 (BAH), Min. Order (D.D.C. July 16, 2023) (denying defendant Javier Algredo Vazquez's motion to preclude in-court identification).

### A. Defendants' Motions to Suppress In-Court Identification

Defendants Algredo and Pulido filed separate motions seeking to suppress their in-court identification by cooperating witnesses anticipated to be called by the government to testify against them, *see* Algredo's ID Mot.; Pulido's ID Mot., which motions are opposed by the government, *see* Gov't's Opp'n to Defs.' Mots. ("Gov't's ID Opp'n"), ECF No. 87. Both motions are denied.

Suppression of an in-court identification of a defendant turns on whether any pretrial identification procedure, such as the showing of an array of photographs, "'‘was impermissibly suggestive,'" and, even if improperly suggestive, "whether, under the totality of the circumstances, the identification was sufficiently reliable to preclude ‘a very substantial

---

[1] The following pretrial motions have been resolved separately: (1) Defendant Algredo's Motion for Disclosure of Expert Testimony, ECF No. 72, *see* Def. Algredo's Resp. to Order To Show Cause, ECF No. 108 (conceding motion should be denied as moot); Min. Order (Nov. 6, 2026) (denying motion as moot); (2) Defendant Pulido's Motion for Preliminary Determination of Conspiracy, ECF No. 67, *see* Min. Order (Nov. 10, 2026) (denying motion as inconsistent with approved practice and not necessary under Fed. R. Evid. 104(b)).

likelihood of irreparable misidentification.'" *United States v. Rattler*, 475 F.3d 408, 411 (D.C. Cir. 2007) (first quoting *United States v. Washington*, 12 F.3d 1128, 1134 (D.C. Cir. 1994) and then quoting *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977)); *see also United States v. Mosquera-Murillo*, 153 F. Supp. 3d 130, 203 (D.D.C. 2015) (BAH), *aff'd*, 902 F.3d 285 (D.C. Cir. 2018). The Supreme Court has made clear that "'[r]eliability of the eyewitness identification is the linchpin' of that evaluation," and such evidence should not be suppressed unless "the 'indicators of a witness' ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion." *Perry v. New Hampshire*, 565 U.S. 228, 239 (2012) (alterations omitted) (quoting *Manson*, 432 U.S. at 114). "To determine whether a photographic identification procedure was impermissibly suggestive, courts consider factors including the size of the array, the manner of presentation by the officers, ... the array's contents, and whether there is evidence that the witnesses were told whom to select or provided with information that would have led them to select a specific individual." *Mosquera-Murillo*, 153 F. Supp. 3d at 204 (internal quotations and citations omitted).

Algredo seeks suppression of in-court identifications of him by an anticipated government witness, Jesus Contreras Arceo ("Contreras"), Algredo's ID Mot. at 1, and Pulido seeks suppression of any in-court identification "by civilian witnesses," Pulido's ID Mot. at 1, which includes Contreras and witnesses referred to by the government as CW-2 and CW-3, *id*. at ¶¶ 2, 6; Gov't's ID Opp'n at 1. [2] As to Contreras, Algredo argues that this witness's in-court identification would be based on an identification resulting from an "unduly suggestive" procedure, citing as support that Contreras identified Algredo after being shown a single

[2] Pulido's oblique reference to a civilian witness, who "was shown a single photo of the codefendant" at "a proffer session on July 15, 2021," Pulido's ID Mot. at ¶ 2, is clarified by the government to refer to CW-3, who was shown a single photo of Pulido "more than seven months after a positive multi-photo procedure," Gov't's ID Opp'n at 5-6 n.12. The admissibility of CW-3's in-court identification of Pulido is discussed *infra*.

photograph of Algredo, but, on a subsequent occasion, on January 27, 2021, Contreras failed to recognize defendant Algredo in a six-photograph array that included Algredo. Algredo's ID Mot. at 1-2.

The government confirms that the 6-photograph array session resulting in the failed identification of Algredo occurred on January 27, 2021, and, due to COVID-19 pandemic restrictions, the photographs were displayed sequentially via a video conferencing platform. Contreras identified Pulido but not the photograph of Algredo at that time, but did identify Algredo from a single photograph displayed to him soon afterwards, on February 3, 2021, indicating that he knew him as "Carlos" and did not recognize the last name. Gov't's ID Opp'n at 2-3 n.6. Contreras reported he had met Algredo "three times" over four years. *Id.* at 3; *see also* Gov't Proffer Notes (dated "03 January 2021") ("Jan. 3, 2021 Gov't Proffer") at JCA-27, ECF No. 88-3. Defendants are correct that a "single photo array" may be "prejudicial," Algredo's ID Mot. at 2, and "unduly suggestive," Pulido's ID Mot. at ¶ 2, and thus "identifications arising from single-photograph displays may be viewed in general with suspicion," *Manson*, 432 U.S. at 116.[3] This is not the end of the analysis, however, since other circumstances may suffice to provide an indicia of reliability for the in-court identification. That is the situation here.

Contreras's knowledge of Algredo provides independent indicia of reliability for an in-court identification, even if the single photo identification were deemed suggestive. The government represents that, on February 3, 2021, upon identifying Algredo, "without further prompting, Contreras Arceo described knowing Algredo Vazquez (identified as "Carlos") as an

---

3 Defendants raise no challenge to the six-photo array shown to Contreras and, indeed, "the D.C. Circuit has held that six photos in an array is 'not impermissibly suggestive.'" *United States v. Pruden*, No. 22-cr-231 (JMC), 2024 U.S. Dist. LEXIS 246941, *6-7 (D.D.C. September 19, 2024) (quoting *United States v. Gantt*, 617 F.2d 831, 840-41, *abrogated on other grounds by In re Sealed Case*, 99 F.3d 1175 (D.C. Cir. 1996)); *see also United States v. Cooper*, 85 F. Supp. 2d 1, 36 (D.D.C. 2000) (holding that a six-photo array was not "unduly suggestive").

associate of Pulido Coracero who was involved in chemical sales and having met with Algredo Vazquez multiple times over a four-year period between 2013 and 2017." Gov't's ID Opp'n at 9-10, *see also* Jan. 3, 2021 Gov't Proffer at JCA-27 (stating that Contreras "recalled meeting" defendant Algredo "three times, between 2013-2017"). Thus, even if the singular photo show-up were suggestive, the "totality of the circumstances" supports admitting Contreras's in-court identification of Algredo. *See Rattler*, 475 F.3d at 411. As the government correctly points out, courts routinely admit identification evidence where, as here, the witness making the in-court identification based that testimony on having met with the defendant on multiple occasions over the course of years. *See* Gov't's ID Opp'n at 10-11 (citing *United States v. Kelsey*, 917 F.3d 740, 750 (D.C. Cir. 2019); *United States v. Henderson*, 320 F.3d 92, 101-02 (1st Cir. 2003); *United States v. Crawford*, No. 98-7045, 1999 WL 157430, at *2 (10th Cir. Mar. 23, 1999); *United States v. Klein*, 93 F.3d 698, 702 (10th Cir. 1996); *United States v. Castro*, 243 F. Supp. 2d 565, 571 (W.D. Va. 2003)). Therefore, Algredo's motion to suppress an in-court identification by Contreras is denied.

To recap as to Pulido, this defendant seeks broader suppression of "any In Court identification of the defendant by civilian witnesses as the product of prior constitutional violations." Pulido's ID Mot. at 1.[4] The government anticipates calling at least three, and possibly four, cooperating witnesses, including Contreras, CW-2, and CW-3, to make in-court identifications of Pulido at trial. All three witnesses identified Pulido in photographs, and all three witnesses stated they had met Pulido on multiple occasions. As already recounted, Contreras was shown six sequential photographs of Hispanic males, including photographs of

[4] Pulido complains that the government had not disclosed information about "out of court identification or non identification procedures relevant" to Pulido, *id.* ¶ 3, and, in opposition, the government supplied additional information as to the out-of-court identifications of both defendants by cooperating witnesses anticipated to be called to testify at trial. Pulido filed no reply to supplement his arguments or further challenge as impermissibly suggestive any of the identification procedures described in the government's submission.

both defendants, and identified and recognized Pulido, whom he "estimated [he had] met well over 100 times in the seven years they knew each other." Gov't's ID Opp'n at 3; Gov't Proffer Notes (dated "27 January 2021") ("Jan. 27, 2021 Gov't Proffer") at JCA-175, ECF No. 88-2. Next, CW-2 "was shown a series of photographs, sequentially." Gov't's ID Opp'n at 4. The government states that the photo viewing occurred in "one of two ways: (1) immediately before the call, the agent sent multiple photographs of Hispanic males and told CW-2 we are going to talk about anyone you may recognize; or (2) the agent instructed CW-2 to put his/her phone on speaker and sent the photographs while they were speaking." *Id.* Regardless, CW-2 identified Pulido and recalled meeting him "approximately four times" from 2014 to 2015. *Id.* CW-2 also recognized Algredo, though was not able to identify him by name, and recalled seeing him on two occasions in "approximately" 2014. *Id.* at 5. In a subsequent debriefing, CW-2 also recalled seeing Pulido and Algredo "when he briefly visited one of the methamphetamine laboratories." *Id.* at 4-5 n.9, n.10. Lastly, CW-3 was shown "seven photographs, sequentially, depicting six males," and identified Pulido, whom he had met "approximately four times" over a "five-to-six-year period." *Id.* at 6; Gov't Proffer Notes (dated "22 December 2020") at 1, ECF No. 88-11. CW-3 did not identify Algredo, as "no identification procedure depicting Algredo Vazquez was ever presented." Gov't's ID Opp'n at 6, n.14.

Based on the government's proffer, Contreras, CW-2 and CW-3 had each met Pulido on multiple occasions. This generally suffices to make the testimony from these three witnesses as to an in-court identification of Pulido admissible. *See Robinson v. United States*, 459 F.2d 847, 858 (D.C. Cir. 1972) ("[T]he identification bids fair to command greater respect when accompanied by a showing that the witness encountered the party on other occasions…"); *United States v. Vega*, 825 F. Supp. 2d 1, 22 (D.D.C. 2010 (TFH), *aff'd*, 826 F.3d 514 (D.C. Cir. 2016) (finding in-court identification was reliable where the witness "saw the defendant multiple times

and had the opportunity to observe him under what appear to be routine circumstances"); *Mosquera-Murillo*, 153 F. Supp. 3d at 207 (finding "only a negligible risk" of "impermissible suggestion" where witnesses "had ample opportunity" to observe the defendant). In fact, courts routinely find identification evidence to be admissible even when the witness only had a single prior notable encounter with the defendant. *See, e.g., Neil v. Biggers*, 409 U.S. 188, 200-01 (1972) (finding "no substantial likelihood of misidentification" where the witness "spent a considerable period of time with her assailant, up to half an hour" and "at least twice…faced him directly and intimately"); *United States v. Kelsey*, 917 F.3d 740, 750 (D.C. Cir. 2019) (finding no error in admission of identification where, "[e]ven assuming the photo array was impermissibly suggestive," the witness and defendant "were together for several hours during the daylight"); *Rattler*, 475 F.3d at 414 (finding identifications were "sufficiently reliable" regardless of whether identification procedures were suggestive because witnesses gave defendant "focused attention for a period of minutes under good lighting conditions"); *United States v. Clarke*, 611 F. Supp. 2d 12, 21 (D.D.C. 2009) (JDB) (finding that "[e]ven if the procedure had been suggestive in this case…identifications were clearly reliable" because witness "spent a substantial amount of time with both men on the day of the crime" and had "another sustained interaction" with one of the men). In short, whether the out-of-court identification procedures used were suggestive is beside the point here since Contreras had met Pulido "well over 100 times," Jan. 27, 2021 Gov't Proffer at JCA-175, and both CW-2 and CW-3 had met him multiple times, Gov't's ID Opp'n at 4, 6.

Accordingly, testimony from Contreras making an in-court identification of Algredo and testimony from Contreras, CW-2 and CW-3 making in-court identifications of Pulido, is admissible, and the defendants' motions to suppress in-court identifications by these cooperating witnesses are denied.

### B. The Government's Motion *in Limine* to Introduce and Authenticate Evidence, and Defendant Algredo's Motion *in Limine* to Preclude Testimony Regarding Drugs Other than Methamphetamine

The government and Algredo have filed competing motions regarding the admissibility of evidence at trial about drugs other than methamphetamine, which is the only drug named in the indictment as unlawfully distributed and imported into the United States and unlawfully manufactured for import into the United States from precursor chemicals. Given these charges at issue, Algredo seeks, pursuant to Federal Rules of Evidence ("FRE") 401 and 403, to preclude admission at trial "of evidence of drugs other than methamphetamine," contending such evidence is "not relevant" and "unfairly prejudicial." Algredo's MIL at 1-2. In opposition, the government seeks to admit, pursuant to FRE 404(b), evidence of uncharged conduct that was part of the same conspiracies but occurred both during and after the indictment as relevant and sufficiently probative so as not to be impermissibly prejudicial under Rule 403. *See* Gov't's MIL at 12-13, 17. The government's arguments are persuasive.[5]

FRE 404(b) provides that evidence of a "crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." FED. R. EVID. 404(b)(1). So-called "propensity" evidence is excluded not because it is irrelevant, but because "it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge." *Michelson v. United States*, 335 U.S. 469, 475-76 (1948);

---

[5] The government also seeks to: (1) admit, pursuant to FRE 902(11), 803(6) and 803(15), "shipping records related to chemicals the Algredo Vazquez brothers purchased during the charged conspiracy and list Algredo Vazquez's business entities as the notify party or consignee," and (2) authenticate, pursuant to FRE 902(13), "electronic mail evidence through certifications of custodians of records," Gov't's MIL at 4, which "mail evidence" consists of "subscriber details and contents of emails for two email addresses used by the Defendants' co-conspirator, Javier, to commit the charged crimes," *id.* at 19. Algredo does not dispute the admissibility of these two sets of evidence, *see* Algredo's MIL Opp'n at 1-2 ("Mr. Algredo does not dispute the admissibility of items 1 (business records) and 3 (electronic mail records)…"), and Pulido has waived any objection to their admission by filing no opposition to the government's motion. Accordingly, the government's motion is granted as to these two sets of evidence.

*see also United States v. Zobel*, 181 F.4th 1258, 1262 (D.C. Cir. 2026) ("The law has long treated this so-called 'character' or 'propensity' evidence as relevant.") (citing *Michelson,* 335 U.S. at 475-76). Rule 404(b) limits the risk that, presented with such evidence of a defendant's uncharged bad conduct, "a jury [might] convict for crimes other than those charged—or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment." *Old Chief v. United States*, 519 U.S. 172, 181 (1997) (quoting *United States v. Moccia*, 681 F.2d 61, 63 (1st Cir. 1982)). Nevertheless, although such propensity evidence may not be used to "prov[e] that a person's actions conformed to his character," *United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (en banc), uncharged evidence of other bad acts by the defendant may be used for other purposes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," FED. R. EVID. 404(b)(2). "In other words, under Rule 404(b), *any* purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered *solely* to prove character." *United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990) (emphasis in original). As the rule merely prohibits evidence of a defendant's other acts "in but one circumstance," the D.C. Circuit has characterized it as "a rule of inclusion rather than exclusion." *United States v. Machado-Erazo*, 47 F.4th 721, 728 (D.C. Cir. 2018) (first quoting *Crowder*, 141 F.3d at 1206 and then quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)); *see also United States v. Cassell*, 292 F.3d 788, 792 (D.C. Cir. 2002) (same).

The post-indictment evidence the government seeks to introduce includes expert testimony and shipping documents regarding seven seizures, from June 8, 2021 to January 10, 2022, of four different methamphetamine precursor chemicals "used to produce, refine, or mask methamphetamine." Gov't's MIL at 12-13. The Court agrees that evidence of these post-indictment seizures is admissible under FRE 404(b). "In conspiracy prosecutions, the

prosecution is 'usually allowed considerable leeway in offering evidence of other offenses to inform the jury of the background of the conspiracy charged . . . and to help explain to the jury how the illegal relationship between the participants in the crime developed.'" *Machado-Erazo*, 47 F.4th at 728-29 (quoting *United States v. Mathis*, 216 F.3d 18, 26 (D.C. Cir. 2000)). Evidence regarding the post-indictment seizures of methamphetamine precursor chemicals is "probative not only of the Defendants' motive and opportunity to engage in narcotrafficking, but also of the scope, persistence, and cohesiveness of the charged conspiracy," by "show[ing] that the underlying conspiracy continued well after the indictment in March 2021." Gov't's MIL at 15.[6]

In addition, the government seeks to introduce evidence that, during the charged drug conspiracies, defendants were engaged in distributing chemicals to manufacture other illicit drugs, including fentanyl, PCP and cocaine. This evidence is in the form of invoices derived from defendants' email accounts revealing that Algredo ordered, in addition to precursor chemicals for the manufacture of methamphetamine, other precursor chemicals used to manufacture fentanyl, a chemical used in the production of phenylcyclohexyl piperidine ("PCP") and a chemical used to process cocaine. *Id.* at 13. Just like the post-indictment seizures, the government urges that defendants' transactions for importation of precursor chemicals used in the production of illicit drugs other than methamphetamine is also admissible as "other crime, wrong, or act" evidence under FRE 404(b). *Id.* at 12. This evidence is relevant to show defendants' knowledge, intent and the "absence of mistake" "to support[] their CJNG clients' other drug manufacturing operations" in addition to methamphetamine, by procuring precursor chemicals for production of these other unlawful drugs. *Id.* at 16. Moreover, since Algredo

---

[6] The indictment was returned on March 2, 2021, *see* Indictment, ECF No. 1, and the government argues that, "[o]ne post-indictment seizure—methylamine hydrochloride seized on June 8, 2021—is arguably direct evidence of the charged conspiracy since the invoice from Javier's emails shows that it was purchased two months earlier on April 4, 2021." Gov't's MIL at 15 n.20. That purchase date, however, still post-dates the March 2, 2021, indictment return and therefore, the June 8, 2021 post-indictment seizure will be analyzed, along with the other post-indictment seizures, under FRE 404(b).

intends to argue that he operated a legitimate chemical import brokerage business, this evidence is probative of this defense and highly relevant and material to this disputed issue in the case by "mak[ing] it less likely that the chemicals [defendants] procured were for innocent or legitimate purposes." *Id.*

Algredo insists that evidence of his transactions involving precursor chemicals for the manufacture of other unlawful drugs is simply "propensity" evidence. *See* Algredo's MIL Opp'n at 4 (arguing that government fails to provide a "non-propensity chain of reasoning"); *id.* at 5 (arguing that the government invites the "inference" that Algredo "is the type of person who knowingly supplies chemicals for drug manufacturing"); *id.* at 6 (arguing that the government seeks to introduce "every other transaction that the government characterizes as suspicious or illicit"). This argument falls far short and fails to grapple with clear binding precedent that has "frequently upheld the admission of evidence regarding other drug transactions as relevant to intent in a charged drug transaction." *United States v. Mitchell*, 49 F.3d 769, 775 (D.C. Cir. 1995); *see also United States v. Thompson*, 921 F.3d 263, 269 (D.C. Cir. 2019) (affirming conviction for conspiracy to distribute and possess with intent to distribute 5 kilograms or more of cocaine on an aircraft registered in the United States or owned by a United States citizen and finding no abuse of discretion by admission of defendant's "involvement in drug transactions, extrinsic to the charged conspiracy," noting evidence was accompanied by instruction that the evidence was "to show the similarity of prior crimes, a common plan or scheme, or to show defendant's *knowledge* of drug transactions and purpose," and cautioning that "when evidence of prior bad acts is introduced to show defendant's knowledge of the type of transactions, it cannot be stale") (emphasis in original); *United States v. Moore*, 75 F. Supp. 3d 444, 451 (D.D.C. 2014) (JDB) (evidence "involving similar drugs to the present case" has "significant probative value regarding … absence of mistake"); *United States v. Sitzmann*, 856 F. Supp. 2d 55, 63 (D.D.C.

2012) (PLF) ("[I]n this drug conspiracy case probative other crimes evidence that goes to the defendant's knowledge and intent should be admitted, as should probative other crimes evidence with respect to the question of absence of mistake or accident."). In this case, too, evidence that the defendants procured precursor chemicals for production of other illicit drugs during the charged conspiracy and continued, post indictment, to engage in the purchase of precursor chemicals for methamphetamine manufacture is plainly not "stale," and further "makes it less likely that the chemicals [defendants] procured were for innocent or legitimate purposes" and is, consequently, highly probative of their knowledge and intent and a common plan or scheme. *See* Gov't's MIL Reply at 4.

Finally, the risk of unfair prejudice does not substantially outweigh the probative value of the post-indictment seizures and other drugs evidence under FRE 403. *See United States v. McGill*, 815 F.3d 846, 883 (D.C. Cir. 2016) (noting courts are required to conduct a Rule 403 analysis for evidence admissible under Rule 404(b)). This is "a high barrier to justify the exclusion of relevant evidence, by requiring that its probative value must be 'substantially' outweighed by considerations such as 'unfair' prejudice." *United States v. Lieu*, 963 F.3d 122, 128 (D.C. Cir. 2020) (citing *Cassell*, 292 F.3d at 796). Algredo does not overcome this "high barrier," and Pulido does not even try. *See supra* n.5.

Contrary to Algredo's allegation that the evidence "will serve no purpose other than to unfairly prejudice [him]," Algredo's MIL at 3, this evidence is highly probative of defendants' knowledge and intent—specifically, whether they knowingly participated in a conspiracy to import precursor chemicals for illicit drug manufacturing, rather than legitimate purposes. *See* Gov't's Mot. at 16. "Evidence tending to demonstrate 'intent, plan, preparation, and motive . . . is particularly probative where the government has alleged conspiracy.'" *Mathis*, 216 F.3d at 26 (quoting *United States v. Sampol*, 636 F.2d 621, 659 & n.23 (D.C. Cir. 1980)). On the other side

of the balance as to whether admission of this evidence would result in "unfair prejudice," the evidence "does not involve past acts having little temporal or logical connection to the crimes at issue," and instead the "evidence is closely tied to the crimes charged and only indirectly suggests distinct offenses." *United States v. Perholtz*, 842 F.2d 343, 356-359 (D.C. Cir. 1988) (affirming admissibility, under FRE 404(b), of evidence of defendants' post-conspiracy conduct). To be precise, the evidence the government seeks to admit, under FRE 404(b), is of the same nature as the intrinsic evidence that would be used to prove the methamphetamine conspiracies—namely, business records and testimony regarding chemical shipments and communications ordering them—and is "no more serious than that charged in the indictment." *Mosquera-Murillo*, 153 F. Supp. at 185, *see also* Gov't's MIL at 18. Therefore, Algredo's motion is denied, and the government's motion is granted.

**C. DEFENDANTS' MOTIONS TO SEVER**

Algredo and Pulido have filed separate motions to sever their trials, *see* Pulido's Sever Mot.; Algredo's Sever Mot., which motions the government opposes, *see* Gov't's Opp'n to Defs.' Mots. ("Gov't's Sever Opp'n"), ECF No. 86. Pulido argues that severance is proper because an "overwhelming[]" amount of the evidence is directed at his co-defendant, and therefore, defendant Pulido would be prejudiced before a jury. *See* Pulido's Sever Mot. at 1. Algredo contends that severance is proper because his co-defendant may choose to testify at a joint trial and potentially prejudice Algredo's lack of knowledge defense. *See* Algredo's Sever Mot. at 1-2. Both defendants' motions are denied.

Joinder of defendants in the same indictment is permitted when, as here, the defendants "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses," FED. R. CRIM. P. 8(b), but the defendants' trials may nevertheless be severed if "the joinder of offenses or defendants in an

indictment . . . or a consolidation for trial appears to prejudice a defendant or the government," *id*. 14(a). In considering a severance motion under Rule 14(a), "[j]oint trials are preferred in federal criminal cases because they 'promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'" *United States v. Tucker*, 12 F.4th 804, 824 (D.C. Cir. 2021) (quoting *Zafiro v. United States*, 506 U.S. 534, 537 (1993)). The D.C. Circuit has instructed that joint trials are especially preferred when "'the respective charges require presentation of much the same evidence, testimony of the same witnesses, and involve ... defendants who are charged, *inter alia*, with participating in the same illegal acts.'" *Tucker*, 12 F.4th at 824 (quoting *United States v. Wilson*, 605 F.3d 985, 1016 (D.C. Cir. 2010)). Severance is only proper "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539; *see also* FED. R. CRIM. P. 14(a).

Pulido expresses concern about the "unfair[] prejudicial spillover of evidence concerning" co-defendant Algredo and argues this poses a "serious risk" of compromising Pulido's rights. Pulido's Sever Mot. at ¶ 2. Severance of trials is not warranted "'absent a *dramatic* disparity of evidence.'" *Tucker*, 12 F.4th at 825 (quoting *United States v. Moore*, 651 F.3d 30, 95 (D.C. Cir. 2011) (per curiam) (emphasis in original)). In an effort to show such a disparity, Pulido points to "the overwhelming documentary evidence" and "recorded calls and transcripts" that are linked to Algredo. Pulido's Sever Mot. at ¶ 3. Even assuming Pulido were right that substantially more *documentary* evidence is available to admit against Algredo than against him, Pulido still fails to show severance is warranted. "In conspiracy trials, severance is generally not mandated despite a disparity in evidence when there is 'substantial and independent evidence of each [defendant's] significant involvement in the conspiracy.'" *United States v. Bikundi*, 926 F.3d 761, 781 (2019) (quoting *Moore*, 651 F.3d at 96 (quoting *United*

*States v. Tarantino*, 846 F.2d 1384, 1399 (D.C. Cir. 1988))). That is the situation here given the extensive overlapping evidence that will be presented by cooperating witnesses against both defendants on both charges and their differing roles in the conspiracy.

Indeed, the government contests the premise of Pulido's demand for severance, namely, that there is a disparity in evidence. According to the government, "the Defendants here each had their own respective roles in the conspiracy" and had a "partnership that both benefited from: Algredo Vazquez financially benefited from acting as the chemical importer, and Pulido Coracero was paid for supplying the chemicals for CJNG's production of methamphetamine for sale into the United States." Gov't's Severance Opp'n at 5-6. The government further states that "[n]umerous cooperating witnesses will describe Pulido Coracero's willing and eager involvement in the scheme including his presence at methamphetamine labs, meetings with CJNG leaders, and years-long agreement to continue facilitating the supply of chemicals necessary for the production of methamphetamine, among other narcotics," and that the documentary issue involving Algredo "reflects the distinct and mutually supporting roles each [defendant] held in the conspiracy." *Id.* at 6-7. In sum, the defendants face the same charges, for which the government will present "much of the same evidence [and] testimony of the same witnesses," since the defendants are charged "with participating in the same illegal acts." *Tarantino*, 846 F.2d at 1399 (finding "severance was not required."). The government has properly shown that the extreme level of disparity required to warrant severance does not exist in this case. *Cf. United States v. Sampol*, 636 F.2d 621, 645 (D.C. Cir. 1980) (vacating conviction and finding severance required for defendant tried only for misprision of a felony and making false statements, whereas his co-defendants were tried for conspiracy and murder, because the quantity and inflammatory nature of the testimony against the co-defendants carried significant risk of a transference of their guilt and created a false impression that defendant was involved in

the conspiracy). Pulido filed no reply contesting the government's description of the evidence to be presented at trial. Therefore, no showing has been made as to such a "dramatic disparity" of evidence that would unfairly prejudice Pulido at trial and warrant severance of his trial from that of Algredo.

Pulido further presses his concern about the documentary evidence to be presented about Algredo's role in the conspiracy, arguing that "[m]ost of the evidence against the codefendant would not be admissible against Mr. Pulido in a separate trial," Pulido's Sever Mot. at 1, but this contention is incorrect. The government correctly notes that "calls and e-mail communications involving Algredo Vazquez would be admissible as co-conspirator statements" against Pulido. *See* Gov't's Sever Opp'n at 6 n.3. Under the plain text of FRE 801(d)(2)(E), such communications would be admissible as statements both "offered against an opposing party" and "made by the [opposing] party's coconspirator during and in furtherance of the conspiracy." FED. R. EVID. 801(d)(2)(E).

Separately, Algredo argues that severance is proper because, at a joint trial, Pulido may testify and his testimony may undercut Algredo's defenses. *See* Algredo's Sever Mot. at 1-2. The government accurately sums up the "chain of hypotheticals" on which Algredo's argument rests: "(1) If the Government's motion to preclude Pulido Coracero's duress defense is denied; (2) then if Pulido Coracero decides to present such a defense; (3) then if Pulido Coracero presents such a defense by testifying about how he was suffering from an immediate threat of death or bodily injury; (4) then if Pulido Coracero expands his testimony to include that Algredo Vazquez was aware [of] what his chemicals would be used for; only then Algredo Vazquez would be so prejudiced as to require a severance of the trial." Gov't's Sever Opp'n at 7-8, *see also* Algredo's Sever Mot. at 2. Algredo presents multiple ways that this chain of hypotheticals, if actualized, could impact his defense, by directly bearing on the issue of Algredo's knowledge,

Algredo's Sever Mot. at 4, 6, 7; by creating a "credibility problem," since "Pulido has a substantial personal interest in presenting Mr. Algredo as knowledgeable about the cartel transactions," *id.* at 7; or by allowing the presentation of "speculative" or "spillover" testimony to which the jury may give undue weight; *id.* at 9-10. None of these hypotheticals warrants a severance. The law is clear that "inconsistent defenses do not *per se* justify severance, even when co-defendants 'point the accusing finger at one another.'" *United States v. Baugham*, 449 F.3d 167, 180 (D.C. Cir. 2006) (quoting *United States v. Moore*, 104 F.3d 377, 384 (D.C. Cir. 1997)); *see also United States v. Haldeman*, 559 F.2d 31, 71 (D.C. Cir. 1976) ("The mere presence of hostility among defendants or the desire of one to exculpate himself by inculpating another have both been held to be insufficient grounds to require separate trials."). Where, as here, "defendants have offered nothing other than vague assertions that their defenses will be conflicting and irreconcilable," severance is not proper. *United States v. Brodie*, 326 F. Supp. 2d 83, 94 (D.D.C. 2004) (ESH).

Although Algredo argues that limiting jury instructions would not cure any prejudice, he offers only conclusory arguments that the jury "cannot simply disregard the testimony concerning Mr. Algredo while considering that testimony in evaluating the credibility and factual basis of Pulido's duress defense." Algredo's Sever Mot. at 10. It is axiomatic that even if there is prejudice from inconsistent defenses, "it is of the type that can be cured with proper instructions, and 'juries are presumed to follow their instructions.'" *Zafiro*, 506 U.S. at 540 (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). Here, too, if the chain of hypotheticals Algredo sets forth occurs at trial, appropriate jury instructions, including that the jury consider the evidence against each defendant separately, would suffice to cure any resulting prejudice. *See Tucker*, 12 F.4th at 825 ("[A]ny prejudice caused by joinder is best dealt with by instructions to the jury to give individual consideration to each defendant.") (internal quotations

and citation omitted); *see also* Joint Pretrial Statement, Proposed Jury Instruction No. 28 ("Multiple Defendants – Multiple Counts"), ECF No. 93-3.[7]

Accordingly, defendants' motions to sever are denied.

## II. CONCLUSION AND ORDER

For the foregoing reasons, it is hereby—

**ORDERED** that Defendant Algredo's Motion to Suppress In-Court Identification, ECF No. 77, is **DENIED**; it is further

**ORDERED** that Defendant Pulido's Motion to Suppress In-Court Identification, ECF No. 78, is **DENIED**; it is further,

**ORDERED** that the government's Motion *in Limine* to Introduce and Authenticate Evidence, ECF No. 79, is **GRANTED**; it is further

**ORDERED** that Defendant Algredo's Motion *in Limine* to Preclude Testimony of Drugs Other Than Methamphetamine, ECF No. 73, is **DENIED;** it is further

**ORDERED** that Defendant Pulido's Motion to Sever Defendants, ECF No. 76, is **DENIED;** it is further

**ORDERED** that Defendant Algredo's Motion to Sever Defendants, ECF No. 82, is **DENIED**.

**SO ORDERED.**

Date: November 10, 2026.

**BERYL A. HOWELL**
United States District Judge

[7] In a last gasp, Algredo lists several requests for "alternative relief," such as holding a pretrial hearing requiring Pulido to testify about "any anticipated testimony" about Algredo's knowledge about "Pulido [] selling chemicals to the cartel," restricting testimony from Pulido and the government about Pulido's duress defense and giving certain limiting jury instructions. Algredo's Sever Mot. at 12-13. These requests appear to be premature for consideration at this procedural juncture.